James Eugene PRICE, Plaintiff-Appellant,

v.

Mary Elizabeth PRICE, Defendant-Respondent.

James Eugene PRICE, Respondent-Plaintiff,

v.

Mary Elizabeth PRICE, Appellant-Defendant.

Nos. 7643, 7640.

Springfield Court of Appeals.

Missouri.

March 4, 1958.

Douglas W. Greene, Springfield, for James Eugene Price.

Charles M. Wantuck, Springfield, for Mary Elizabeth Price.

McDOWELL, Judge.

The appeals in the above numbered cases are from a judgment of the Circuit Court of Greene County, Missouri, denying a divorce to plaintiff on his petition and to defendant on her cross-bill.

On January 9, 1957, James Eugene Price filed a petition for divorce against his wife, Mary Elizabeth Price, in the Circuit Court of Greene County, alleging plaintiff and defendant were married March 3, 1949 and separated July 31, 1956. As grounds for divorce the petition stated: That defendant became cold and indifferent to the plaintiff, quarrelsome, and lost all love and affection for plaintiff and children and that she lived beyond his means and was extravagant.

It alleged that three children were born to this marriage, Douglas Wesley, age six years, Cynthia Ellen, age 5 years, and Gregory Eugene, age 16 months.

The prayer was for divorce and custody of the children.

The defendant's answer was a general denial and cross-bill for divorce.

In the cross-bill defendant alleged: That plaintiff was cold and indifferent toward her; that he was extremely jealous, without provocation or just cause; that he was fault-finding and quarrelsome with her; that he refused to take her out socially; that he told her he wanted her parents, instead of him, to support her and that he lost all interest in the home and seemingly lost all love and affection for the defendant.

The prayer was for divorce, care and custody of the children, monthly support as alimony and child support and attorney fees.

The cause was tried March 25, 1957 and judgment rendered for the defendant on plaintiff's petition and for plaintiff on the defendant's cross-bill. From this judgment both plaintiff and defendant appeal.

These appeals are consolidated for opinion. Plaintiff's appeal is Case No. 7643 and defendant's appeal is Case No. 7640.

In the trial court's memorandum, he made this statement:

"* * * Here we have a case of two young married people where there has not been one word raised about their morals; that they are not good citizens, and people of high class morals.

"Now, the second peculiar thing about this case is, that here is the husband, whose principal complaints are about his wife in a period of time in which she was in a psychiatric ward of St. John's Hospital, and then out, then back in, and then at Nevada as a voluntary mental patient. And he evidently thought she was mentally disturbed, because he filed a complaint in the Probate Court asking her to be adjudged incompe-.

tent, so that she could be confined in Nevada, probably, because, evidently, he thought she should be there longer to be treated."

The gist of plaintiff's evidence is that he and defendant were married March 3, 1949; and that although he alleges in the petition they were separated July 31, 1956, there is no record evidence showing the circumstances of separation.

That except for two years, from 1949 to 1951, the parties made their home in Springfield. Plaintiff is employed by the Frisco Railroad, as secretary, at a salary of $425 per month, take home pay $390. Defendant was a trained nurse and for some two years, from 1951, she worked in St. John's Hospital. Plaintiff testified that while his wife was working she made the statement to him that "she had no intention as winding up a mother and a matron, and that she was professional and she was not going to be the mother of a bunch of kids". There was born to this marriage, three children, Douglas Wesley, age 6, Cynthia Ellen, age 5, and Gregory Eugene, age 16 months. At present the baby is in custody of plaintiff's sister and the two older children are with plaintiff, cared for by a housekeeper; that the children are in a good home and well cared for.

As to the first indignity alleged, to-wit, that defendant was cold and indifferent to the plaintiff, he testified: that during the entire married life, for periods at a time, defendant refused him privileges as a husband and this condition grew generally worse until just prior to the separation when she completely refused him such relation. He stated defendant said she no longer loved him or the children and that she was through.

As to defendant's extravagance, witness stated that defendant seemed to have no conception of finances during their married life; that he talked to her about finances and she stated she believed in bettering one's self. That on one occasion she purchased a set of child craft books, which was beyond their ability to pay and he talked the agent into taking them back.

On cross-examination of defendant, there was some evidence that she purchased a garbage disposal and dishwasher for the house. It was admitted these purchases were made while defendant was working at the hospital or shortly thereafter.

Plaintiff offered no evidence as to the defendant being quarrelsome.

The principal complaint seems to be as to defendant's treatment of the children. Plaintiff testified that she said "she did not love the children"; that they were just "little animals" or "brats"; that when he came home from work defendant would be in the house with the baby and the two older children would be gone and she would not know where they were; that he found them out on the street, sometimes a block or two blocks from home. He stated on one occasion he came home, the baby was alone, needed changing, and that he finally found defendant in a field cutting weeds.

Plaintiff testified that the treatment of the children complained of was limited to a period between June 22nd to August 20th. He said during this time, except at breakfast, defendant only prepared sandwiches for the family to eat; that she said she was on a diet and the family would have to be on a diet likewise; that it was during this time defendant called the children "little animals" and "brats". He said she had an aversion for pens and put the baby's pen in the closet, permitting the baby to crawl all over the house; that he broke a lamp, crawled through the glass and cut his knees; that on one occasion she picked the baby up and held it out by one arm and one leg and said slowly, "This child is too sweet to be alive".

He testified that he and defendant would be sitting in the living room watching television and suddenly she would slap one of the children, without provocation, and, at one time, slapped him; that one time when they were returning home about 9:00 p. m.

she, without provocation, backhanded Cynthia and knocked her down and across the room; that in the latter part of July or first of August, 1956, while they were visiting in his mother's home, defendant picked up the baby, threw him over her shoulder and had plaintiff not caught the child, he would have gone through a glass bookcase. This incident was corroborated by his mother. Plaintiff stated that during this period he had to cook for the children, get up at night and care for them, etc.

He testified the children were permitted to play with matches and defendant thought it very funny; that Douglas ran through bonfires. He stated she finally agreed to cooperate with him in preventing the use of matches.

Plaintiff and his mother testified that the baby was allowed to crawl on the floor and chew on light and television cords. He said defendant made the statement, "If it kills him, it will kill him"; that the children were permitted to roam about the streets. There was some testimony that when the children were received by plaintiff, they were emotionally disturbed; that the little boy would cry, stamp his feet and have tantrums but that now they were happy and contented.

Plaintiff's mother testified that the maternal grandparents had the two older children for a while and that the grandmother called her, by phone, and said she was unable to control them.

Plaintiff offered evidence as to his good reputation and as to his good treatment of his wife. There seems to be no dispute as to the good reputation of plaintiff for morality.

Plaintiff's testimony showed that he lived in a rented house and paid $50 per month rent; that he employed a housekeeper to care for the two older children and paid her $60 a month; that he and defendant owned a home that cost $10,000 on which there was a mortgage of $9,200. We think it unnecessary to set out all the other items of property owned by plaintiff as the evidence is undisputed that his indebtedness exceeds the value of his property. He still has unpaid doctor bills incurred in treating the defendant.

Defendant testified that she is now 30 years of age; that she and plaintiff were married March 3, 1949, and lived together until about September 26, 1956. She said she was in the hospital the last of July; that actually there was no formal separation; that she treated her husband the best she knew how, but he was cold and indifferent toward her. She said plaintiff worked from 8:00 a. m. until 5:00 p. m., and worked at night an awful lot; that he was jealous with everyone who made friends with her, even jealous of her parents and talked about his own parents after they had visited them; that he was critical of both sets of grandparents. She testified that plaintiff thought she should be able to watch the children every minute of the time, and made her feel uncomfortable in the home in that she should always have them in her eyesight. She said she could not do anything to please him; that during their married life the only social life she had was visiting her relatives; that plaintiff very seldom took her to places for entertainment. She testified that while she was in the hospital he told her he wanted her parents to support her. She said he lost interest in the home and all love and affection for her. and that she would not take him back.

In answer to plaintiff's testimony as to her denial of her husband's privileges, she answered: "Well, he only considered his own desires". She said plaintiff would sulk and was cold and indifferent. She testified there never was a time she didn't love her children and denied that she told plaintiff she didn't love them. She said when she purchased the child craft books, plaintiff testified to, he was present and agreeable to the purchase; that she was never more extravagant than other persons.

As to the testimony of plaintiff regarding defendant's preparation of sandwiches

for the family, she said she was a registered nurse and knew the nutritional value of foods and she felt she had always given the children the best she had to give them. She stated "I tried to give them a well balanced diet". She denied she had ever indicated or said she wanted to get rid of the children. She admitted she may have made statements that the children were like little animals but had no intention of casting any reflection on them. She denied slapping the children, without cause, and said she never used a round of a chair to punish them with. She admitted putting the baby on her shoulder but said she never turned him loose or threw him over her shoulder, as testified to by plaintiff. She said she always got up at nights to care for the children but when she was released from the hospital, plaintiff did get up a time or two to care for them, but that was all. She also said that plaintiff helped her occasionally with the housework but stated she did the biggest part of it.

As to the cutting of weeds on property, other than owned by plaintiff, she testified the weeds were growing on property owned by the city adjoining their lot, and that she did cut them to get rid of mosquitos and because of the looks. She said the city had cut all the weeds excepting where the street was to go through, and that was where she cut the weeds.

Defendant testified that when the purchases, testified to by plaintiff, were made by her, she was working at St. John's or possibly just after she quit there. She said she spent the money she earned to help pay the bills and for groceries.

Defendant admitted she went to plaintiff's sister's home and picked up the baby and took him away; that a writ of habeas corpus was issued and the child returned to the sister. She said from what was stated in the habeas corpus trial, she understood she could not have the children until after the trial.

She testified she now lives with her parents, Mr. and Mrs. Orin D. Putman, on an 80 acre farm, in a modern five room house and upstairs, containing three bedrooms.

On cross-examination, defendant testified she went to her parents' home on January 8, 1957; that she had not tried to go back to work because she didn't want to. She said she took care of some patients in St. Louis, only temporarily, last week; that she talked to the nurses at St. John's and Burge Hospitals and they said they would take her back but she had not returned to work.

She said the divorce action was filed the day she went to her parents' home from the hospital.

She testified that on April 8th or 10th, 1956, she was hospitalized at St. John's; that she first entered the medical ward and was later transferred to the psychiatric ward; that she was in the general medical ward two weeks and in the psychiatric ward until the latter part of June; that she then returned home and remained until the last part of August, when her husband took her back to St. John's, where she stayed until September 26th, and, on that day, was transferred to the State hospital and remained there until January 8th. She said her treatment in the State hospital was just rest; that her condition was caused by the surroundings in her home. She testified that on January 18, 1957, her husband tried to get her hospitalized involuntarily through the Probate Court and that she was served with papers; that the proceedings in the Probate Court were dismissed; that the period from June 22nd to August 18th or 20th, the time which her husband referred to, was the period she was home.

The evidence is that the defendant went to the mental hospital at Nevada voluntarily because her husband wanted her to go.

Two doctors, psychiatrists, were present to testify as to defendant's condition, but, upon objection, the testimony was not admitted.

Defendant offered testimony that her care of the home and family was proper and that she bore a good reputation for morals and taking care of her children and that the plaintiff was continually watching her, especially as to the care of the children. However, these same witnesses testified that the plaintiff bore a good reputation for morality.

A neighbor, Byron Wolfe, testified that plaintiff watched the defendant but that he was not rude to her. His wife testified she lived by the parties three years, had watched Mary Price take care of her children and that that care was excellent. She said plaintiff's children and her children played together. She stated plaintiff watched his wife's every move and questioned every right of every move as to whether it was right or wrong.

Other witnesses testified as to the good treatment of the children by the defendant. However, the same testimony was offered on the part of plaintiff by other witnesses.

We think we have stated sufficient facts for a proper decision of the issues involved.

We will first consider the appeal in case No. 7643.

In our opinion we will refer to appellant as plaintiff and to the respondent as defendant, the position they occupied in the trial of the divorce action in the lower court.

■ In divorce actions, the court of appeals is bound to review the whole record and reach its own conclusion and has ultimate responsibility to direct entry of such judgment as, in its opinion, is justly warranted by the evidence, but where there are irreconcilable conflicts in the testimony, and decisions rest largely upon witnesses' credibility, the court of appeals would give due deference to the trial judge who saw and heard all of the witnesses. White v. White, Mo.App., 290 S.W.2d 178; Dietrich v. Dietrich, Mo.App., 294 S.W.2d 569; May v. May, Mo.App., 294 S.W.2d 627.

Plaintiff assigns as error the action of the trial court holding that plaintiff had not sustained the burden of proof to support the allegations in his divorce petition.

He first contends that in a divorce suit the burden is upon the plaintiff to prove marital misconduct of defendant and that plaintiff is the innocent and injured party. To support this contention Caffey v. Caffey, Mo.App., 118 S.W.2d 1047 is cited. This appeal was decided by this court in 1938. On page 1048(1, 2) the court stated:

■ "Although a divorce proceeding is a statutory action and primarily one at law, * * * it is nevertheless the right and duty of an appellate court, as in equity cases, to review the evidence for itself. * * * In so doing, when the evidence is conflicting and close the appellate court will defer largely to the trial judge, who had the parties and witnesses personally before him, and on such account afforded a favorable opportunity to determine their credibility; however, as we have stated above the appellate court must examine the evidence and make its own findings; and it will not be bound by the trial court's conclusions, if the same are found to be erroneous. * * *

"In a divorce suit the burden of proof is upon the plaintiff to show both the marital misconduct of the defendant and that he is the innocent and injured party. * * *"

This same law was declared in Rusche v. Rusche, Mo.App., 200 S.W.2d 577, and in Pointer v. Pointer, Mo.App., 251 S.W.2d 334, 337(1, 2). In all of these authorities it is held that proof of wranglings and exhibitions of temper due to a lack of conciliatory spirit on the part of both parties, standing alone, is insufficient to support a decree.

■ Following the law in Caffey v. Caffey, supra, relied upon by plaintiff, we should defer to the judgment of the trial court. We agree with the trial court's finding of fact, to-wit, "practically all acts which both of these parties have complained

of are the things that take place in the privacy of the home between the husband and wife." Plaintiff testified that his wife said she didn't love him or the children any more; that she committed certain acts in the care of the children, was frigid and didn't live with him as a wife and was extravagant, and other matters which took place in the home during their married life. The wife denied these accusations and testified that the husband was guilty of such misconduct. In other words, the evidence in the divorce action is conflicting and close and we find that the trial court was justified under the evidence in finding that the plaintiff failed to make a case.

There is another reason why the court's judgment should be sustained. This reason was clearly stated by the trial court as follows: "Now, the second peculiar thing about this case is, that here is the husband, whose principal complaints are about his wife in a period of time in which she was in a psychiatric ward of St. John's Hospital, and then out, then back in, and then at Nevada as a voluntary mental patient. And he evidently thought she was mentally disturbed, because he filed a complaint in the Probate Court asking her to be adjudged incompetent, so that she could be confined in Nevada, probably, because, evidently, he thought she should be there longer to be treated".

If plaintiff's complaints are true, defendant was not responsible when the acts were committed.

We think it unnecessary to discuss plaintiff's second contention that indignities to warrant granting of a divorce or denial thereof, ordinarily must amount to a continuous course of conduct, and that course of conduct must be such as to connote settled hate and plain manifestation of alienation and estrangement.

This law was properly declared in Garton v. Garton, Mo.App., 246 S.W.2d 832.

Judgment of the trial court affirmed in case No. 7643.

The court will next consider the appeal of the defendant in case No. 7640.

■ Under assignments of error in this case, defendant (appellant) asserts that the trial court erred in refusing to grant her a decree of divorce and care and custody of the minor children on her cross-bill.

Section 452.010 RSMo 1949, V.A.M.S. sets out the statutory causes for divorce and Section 452.020 V.A.M.S. provides for the filing of a cross-bill.

We do not agree with defendant under this allegation of error that she was entitled to a divorce and the care and custody of the minor children on her cross-bill.

The trial court properly found that the facts upon which defendant relies for divorce primarily took place in the privacy of the home between plaintiff and defendant. Defendant asserts certain acts of conduct on the part of plaintiff as indignities, and he denies them. Following the law that where there are irreconcilable conflicts in the testimony and the decisions rest largely upon witnesses' credibility, the court of appeals would give due deference to the findings of the trial judge. We sustain the trial court's judgment. May v. May, Mo.App., 294 S.W.2d 627.

■ We, likewise, hold that there was no error in refusing defendant the custody of the minor children. Under the law, when an action for divorce is dismissed, the court is without power to award custody of minor children. (See authorities cited hereafter.)

■ Outside the power of the court to grant custody of the children to defendant, he would have been justified in denying custody to her for the reason of her health condition. On January 8, 1957, she was released from a mental hospital, and, since that time, has either been unable to work or refuses to work. She is making her home with her parents. The evidence is undenied that the children are being well cared for by the plaintiff and his sister,

where plaintiff has opportunity to observe the care.

■ In granting custody of a minor child its welfare is the prime object of the court, and, under the testimony in this case, even if a divorce had been granted, the court would have been justified in not granting custody of the children to defendant.

It is contended that even though the trial court did not grant a decree of divorce to either party, he could and should have entered an order as to custody of the children, pending an appeal.

To support this alleged error, Ex Parte Badger, 286 Mo. 139, 226 S.W. 936, 14 A.L.R. 286, is cited. This is a habeas corpus proceeding. The opinion was rendered by the Supreme Court en banc. The petitioner was sentenced by the trial court for contempt and sought relief on the ground that the court was without jurisdiction. The wife had filed a bill in equity against the petitioner for maintenance and custody of their minor children. Custody was granted and judgment affirmed by the Kansas City Court of Appeals. The Supreme Court held that regardless of statute, equity may protect personal rights, and particularly those of infants, who may be protected, even from their parents. It did not discuss the question of the court's power to award custody of children in a divorce action when the decree of divorce was refused.

Defendant, likewise, cites Houts' Missouri Pleadings and Practice, Vol. 3, § 868, p. 507. There is nothing said under this citation about the question involved here.

In Klenk v. Klenk, Mo.App., 282 S.W. 153, Judge Bennick, speaking for the court, on page 157 of the opinion, stated:

"As we have indicated above, an action for divorce is purely a statutory proceeding. Turning to the statutes, we find that it is provided in section 1806, R.S.1919 [Section 452.070 RSMo 1949, V.A.M.S.], that—

" 'When a divorce shall be adjudged, the court shall make such order touching * * * the care, custody and maintenance of the children, or any of them, as, from the circumstances of the parties and the nature of the case, shall be reasonable.'

"This section of the law would seem to indicate that it is only when a decree of divorce is granted that the court has authority to award the children to either of the parents. It must be borne in mind, however, that we are speaking now only of the right of the court, as incident to the suit for the decree, to determine the custody of the children, and not of the general powers of a court of equitable jurisdiction independent of statute.

"Defendant, however, contends that the court had jurisdiction of her cross-bill by reason of section 1813, R.S.1919, as amended Laws 1921, p. 202 [Section 452.150 RS. Mo 1939, V.A.M.S.], and section 1814, R.S. 1919 [Section 452.120 RSMo 1939, V.A.M. S.]. These statutes, in substance, provide that the father and mother, living apart, are entitled to an adjudication of the circuit court as to the powers, rights, and duties in respect of the custody and control and of the services and earnings and of the management of the property of their unmarried children without any preference as between father and mother, and that neither parent has any right paramount to that of the other. It is at once apparent that the effect of these statutes is to abrogate the former rule that the father, as the natural guardian of the children, is, if morally fit, entitled to their custody as against the mother. We find nothing in either section which empowers the court, in an action for divorce, to award the custody of the children to either parent when a decree of divorce is denied."

In this case the court discusses the Badger case, cited by defendant in the instant case, in which the children were not awarded by virtue of the statute, but by reason of the inherent jurisdiction of a court of

equity to provide for the comfort and well-being of minor children as against the parent.

In King v. King, 42 Mo.App. 454, it was held that where an action for divorce was dismissed, and the defeated party took an appeal within the time permitted by law, the trial court should not, pending the appeal, interfere with the custody of the children by supplemental proceedings in the cause. Section 452.070 RSMo 1949, V.A.M.S. (Note 173); 113 A.L.R., page 911; 163 A.L.R., Custody of Children, page 1321.

We find no merit in this alleged error.

Under point 3, defendant contends that she should have been awarded custody of the minor children as prayed for in her cross-petition.

Under the law as declared in Klenk v. Klenk, supra, the court was powerless to award custody after dismissal of the divorce petition. Section 452.070 RSMo 1949, V.A.M.S.

It is unnecessary to discuss the authorities cited. Such authorities do not aid defendant's contention.

Under point 4, it is urged that since the baby was in the hands of a third party, defendant was entitled to its custody.

■ The same law applies to this alleged error as under errors alleged in points 2 and 3. The court could not award custody of the child after it dismissed the divorce petition. Section 452.070 RSMo 1949, V.A.M.S.

The same law applies as to error alleged in point 5. This contention was thoroughly discussed by Judge Bennick in Klenk v. Klenk, supra, and cited as an authority under this point.

Under error No. 6, it is contended that under our present Code, all claims, whether legal or equitable, must be joined and the court should have taken cognizance of this principle.

■ With this contention we cannot agree. Section 509.110 provides that pleadings may be in the alternative; that a party may state as many separate claims or defenses as he has, legal or equitable. This has no bearing on the matter under the alleged error. Custody of children is a matter of which the courts are never barred from protecting. Res judicata does not apply where the interest of a child is involved. It would be against public policy to so hold.

■ Under error No. 7, it was contended that error was committed by the trial court in permitting Dr. Uyeno to testify as he did.

The record discloses that the doctor did not testify as to any confidential relationship with defendant. He was merely qualified and stated that he was practicing psychiatry in the mental hospital in Nevada and that defendant had been a patient. He did state that defendant's commitment was involuntary.

Section 491.060 RSMo 1949, V.A.M.S. provides persons incompetent to testify. Under (5) it is stated: "A physician or surgeon, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon".

We find no merit in this contention.

We need not discuss point 8. Our duty in determining the issues in a divorce action is clearly set out in Clark v. Clark, Mo.App., 306 S.W.2d 641. We review the whole record and reach our own conclusions under the law and evidence except in cases where there is irreconcilable conflict of the evidence on the matters to be proved, in which case we defer to the findings of the trial court. (See cases cited in our opinion in case No. 7643.)

The last alleged error is that the trial court refused to allow attorney fees and suit money on appeal.

This alleged error is not before us for decision because there was no appeal from the trial court's judgment on defendant's motion for attorney fees and suit money. The taking of an appeal in a divorce action proper does not divest the Circuit Court of jurisdiction to adjudicate the matter of alimony and suit money pending the appeal since that question, though necessarily embodied in the action for divorce and referable to it, is nevertheless a separate and distinct matter not arising until after the entry of final judgment, and calling for an order from which a separate and distinct appeal will lie. Jones v. Jones, Mo.App., 164 S.W.2d 162; State ex rel. Kranke v. Calhoun, Mo.Sup., 232 S.W. 1038; Noll v. Noll, Mo.App., 286 S.W.2d 58; Price v. Price, Mo.App., 281 S.W.2d 307. See 11 Mo.Dig., Divorce, and Pocket Part.

Judgment in case No. 7640 affirmed.

STONE, P. J., and RUARK, J., concur.